# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 03 C 1086 | DATE | 10/25/2004 |
| CASE TITLE | LUDWIG vs. PILKINGTON | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

1) ☐ Filed motion of [ use listing in "Motion" box above.]
2) ☐ Brief in support of motion due _____.
3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
4) ☐ Ruling/Hearing on _____ set for _____ at _____.
5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
7) ☐ Trial[set for/re-set for] on _____ at _____.
8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
10) ■ [Other docket entry] Defendant's motion for summary judgment is denied. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | OCT 28 2004 | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | 86 |
| | Mail AO 450 form. | U.S. DISTRICT COURT | | |
| | Copy to judge/magistrate judge. | 2004 OCT 27 PM | date mailed notice | |
| DW | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| VICKI LUDWIG, LLOYD LUDWIG, KIM NANOUSKI and JOSEPH NANOUSKI, individually and on behalf of all persons similarly situated, | |
| Plaintiffs, | No. 03 C 1086 |
| v. | Judge James B. Zagel |
| PILKINGTON NORTH AMERICA, INC., | |
| Defendants. | |

**DOCKETED**
OCT 2 8 2004

## MEMORANDUM OPINION AND ORDER

### Background

Since 1931, PNA has owned and operated a glass manufacturing facility in Ottawa, Illinois, which is adjacent to the Village of Naplate ("Naplate"). For many years, arsenic was used at this facility as a raw material and was generated, in both liquid and solid form, as a waste product. Plaintiffs allege that PNA has, over the course of 70 years, negligently, recklessly, and/or intentionally disposed of arsenic-containing waste in multiple quarries located on PNA's property as well as in off-site areas adjacent to the PNA facility. According to the Plaintiffs, this improper disposal caused both the soil and the groundwater in Naplate to become contaminated with arsenic. Plaintiffs further allege that even though PNA has known about this for at least 15 years, PNA has failed to investigate, remediate, or notify Plaintiffs about the contamination. Plaintiffs seek to enjoin PNA from generating contamination, require PNA to fully investigate and remediate the existing contamination, require PNA to reimburse them for costs incurred, and recover compensatory and punitive damages.

86

## Analysis

Just over one month before the liability phase of this case was set to begin, Pilkington, with leave of this court, filed a motion for partial summary judgment on the issues of direct groundwater contamination and soil contamination from aerial dispersion of arsenic. Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). In determining whether any genuine issue of material fact exists, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue of fact exists only when, based on the record as a whole, a reasonable jury could find for the non-movant. *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999).

### A. Pilkington's Statute of Limitations Arguments

Pilkington argues that Plaintiffs' claims of direct groundwater contamination and soil contamination from airborne arsenic pollution are barred by Illinois's five-year statute of limitations.[1] With respect to the groundwater contamination, Pilkington claims that Naplate residents were aware or should have been aware of the possibility of groundwater contamination long before February 1998, five years prior to filing the instant Complaint. To support this

---

[1] Under Illinois law, property damage claims must be brought within five years after the cause of action accrued. 735 Ill. Comp. Stat. Ann. 5/13-205 (2004). In Illinois, the courts apply the "discovery rule" to determine when a cause of action accrues and the statute of limitations begins to run. *See McWane, Inc. v. Crow Chicago Indus., Inc.*, 224 F.3d 582, 585 (7th Cir. 2000). "The Illinois Supreme Court has held that a cause of action accrues when a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused." *Landry v. Keene Corp.*, 811 F. Supp. 367, 373 (N.D. Ill. 1993)(citing *Nolan v. Johns-Manville Asbestos*, 421 N.E.2d 864, 868 (Ill. 1981).

2

argument, Pilkington points to the long-time discussions between Pilkington, Naplate officials, and Naplate residents, concerning the possibility of groundwater contamination. Beginning in 1986, Naplate officials and residents were informed by Pilkington that the St. Peter Sandstone aquifer ("the upper aquifer") was contaminated with arsenic. The upper aquifer is one of three separate aquifers through which groundwater passes under Naplate; the aquifers are separated by layers of stone. Although the upper aquifer was not used for drinking water, there was some concern of cross contamination to the New Richmond Sandstone aquifer ("the middle aquifer"), which does supply Naplate's drinking water.

Pilkington's arguments, however, lose much of their force when the results of its own testing of the middle aquifer is taken into consideration. In response to its concerns as well as the community's concerns over contamination of groundwater, Pilkington engaged in extensive groundwater testing between 1986 and 1995, which showed either no contamination or minimal contamination. Information concerning the lack of contamination in the middle aquifer was actively disseminated throughout Naplate by Pilkington's representatives and the media. The following are some relevant examples:

- On May 28, 1986, Naplate's Board President granted Pilkington permission to install groundwater monitoring wells in Naplate.

- On September 17, 1986, Robert DiNardo, a Pilkington representative, stated in the Ottawa Daily Times "we are not concerned that anyone is at risk."

- On September 18, 1986, the Ottawa Daily Times reported that Naplate's drinking well was tested and no concentration of arsenic was found in Naplate's drinking supply.

- On January 6, 1987, the Ottawa Daily Times reported retesting mirrored previous results showing no contamination in the public drinking water.

3

- On April 29, 1991, Ed Ryan, a company environmental engineer, stated in the Ottawa Daily Times that "we've been working with the EPA on this all along. Nobody's at risk. Nobody's drinking the water [that's contaminated]."
- In June 1992, the middle aquifer tested positive for arsenic in the amount of 0.0066 mg/L, an amount well below the IEAP's standard of .05 mg/L.

The information disseminated by Naplate officials and by Pilkington stated over and over again that the middle aquifer, containing Naplate's drinking water, was not contaminated with arsenic. This, in my opinion, could have led the Plaintiffs to reasonably believe that Naplate's groundwater had not been contaminated. More importantly, class representatives Kim Nanouski and Lloyd Ludwig testified in depositions that they did not have knowledge of groundwater contamination before 2002. Additionally, none of the other class members deposed testified to having had prior knowledge. At a bare minimum, these circumstances establish a genuine issue of material fact concerning when Plaintiffs should have discovered the contamination of their groundwater, which is best left for a jury.

With regards to the arsenic contamination that may have resulted from Pilkington's so called "fugitive emissions," Pilkington's arguments are much the same. Pilkington does, however, present two additional letters as evidence to show Plaintiffs had knowledge of soil contamination prior to 1998. The first is a letter written by the Village Clerk in 1954 complaining about dust emanating from Pilkington's waste pits. Given the age of the letter and the vague nature of its reference to dust, there is a very distinct possibility that the current residents of Naplate were either unaware of its existence or did not know it dealt with arsenic-containing waste. The second is a report from the IEPA, given to a Village official, which discussed the potential for contamination via aerial dispersion. Since there is no direct link

4

between the Plaintiffs and this report, it is also not enough to overcome Plaintiffs' dispersion testimony that they did not become aware of the contamination before 2002. Since there still remains a genuine issue of material fact as to when the Plaintiffs became aware of the alleged arsenic contamination from aerial dispersion, this issue is also best left for the jury.

In addition to arguing the existence of a material question of fact as to knowledge of contamination, Plaintiffs also claim summary judgment is inappropriate because the tortious activity has been ongoing, at least as to groundwater contamination, and has, therefore, tolled the statutory period. Plaintiffs claim some contamination has been caused by Pilkington's on-going maintenance of arsenic-containing landfills. Whether Pilkington's tortious activity has, in fact, been ongoing is also a genuine issue of material fact, creating additional grounds for denial of summary judgment.

## B. Plaintiffs' Expert Roy Ball

Pilkington argues for summary judgment on Plaintiffs' aerial contamination claims because, in Pilkington's opinion, Plaintiffs have not presented any admissible evidence showing that aerial arsenic emissions emanating from Pilkington's Ottawa facility caused contamination in Naplate. In support of that theory, Pilkington argues that the opinion of Plaintiffs' expert, Roy Ball, on aerial dispersion of arsenic contamination, is inadmissable because it is not based on what Pilkington considers to be a sound enough methodology to satisfy Fed. R. Evid. 702 and *Daubert*. *See Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996). Pilkington's criticisms of Dr. Ball's analysis lie primarily with his failure to use computer modeling to recreate the path taken by the emissions allegedly released from the Ottawa facility and his failure to consider other locations as sources of arsenic emissions.

5

Instead of modeling, Dr. Ball relied on information provided about the actual amount of arsenic released and historical wind patterns. He undertook a statistical analysis of the data and rendered his opinion based on that analysis. As part of this analysis, Dr. Ball compared the statistical signatures of contamination found within Naplate to contamination found within the Ottawa site. In Dr. Ball's opinion, this comparison showed a direct correlation between the contamination present on the Ottawa site and the contamination found in Naplate. While this approach may, according to Pilkington's expert, be less accurate than a modeling approach, it is sufficiently reliable to warrant the jury's consideration. Pilkington's criticisms of accuracy are best directed towards weight, not admissibility. Furthermore, Dr. Ball states that his analysis was done in accordance with a statistical technique described in many standard textbooks and endorsed by USEPA guidance documents. It is my opinion that Dr. Ball's analysis meets the reliability requirements of Rule 702 and *Daubert* and will assist the jury in rendering a decision in this case.

For the reasons stated above, Pilkington's Motion for Partial Summary Judgment is DENIED.

ENTER:

James B. Zagel
United States District Judge

DATE: 25 Oct 2004